**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

**HONORABLE VIRGINIA A. PHILLIPS, U.S. DISTRICT JUDGE**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **PLAINTIFF,** ) | **CASE NO.** |
| ) | |
| **vs.** ) | **CR 20-370-AB** |
| ) | |
| **SANG BUM NOH,** ) | |
| ) | **PAGES 1 TO 29** |
| **DEFENDANT.** ) | |
| _____ ) | |

**REPORTER'S TRANSCRIPT OF**
**SENTENCING**
**MONDAY, DECEMBER 6, 2021**
**10:00 A.M.**
**LOS ANGELES, CALIFORNIA**

_____

**MIRANDA ALGORRI, CSR 12743, RPR, CRR**
FEDERAL OFFICIAL COURT REPORTER
350 WEST 1ST STREET, SUITE 4455
LOS ANGELES, CALIFORNIA 90012
MIRANDAALGORRI@GMAIL.COM

**APPEARANCES OF COUNSEL:**


**FOR THE PLAINTIFF:**

 BILAL ESSAYLI
 UNITED STATES ATTORNEY
 BY:  SCOTT DUBOIS
 Assistant United States Attorney
 United States Courthouse
 312 North Spring Street
 Los Angeles, California 90012


**FOR THE DEFENDANT:**

 BIRD MARELLA RHOW LINCENBERG DROOKS & NESSIM LLP
 BY:  BENJAMIN N. GLUCK
 BY:  CHRIS LEE
 1875 Century Park East
 23rd Floor
 Los Angeles, California 90067

**LOS ANGELES, CALIFORNIA; MONDAY, DECEMBER 6, 2021**

**10:00 A.M.**

**---**

THE COURT:  Calling item No. 3, case No. LA CR 20-370, United States of America versus Sang Bum Noh.

Counsel, please state your appearances.

MR. DUBOIS:  Good morning, Your Honor. Scott Dubois for the United States.

THE COURT:  Thank you.  Good morning.

MR. GLUCK:  Good morning, Your Honor. Benjamin Gluck and Chris Lee for Mr. Noh who is present.

THE COURT:  Thank you.  Your client is being assisted by an interpreter?

MR. GLUCK:  Your Honor, Mr. Noh speaks English pretty well, so we asked for an interpreter on standby in case there is a need for it.  But for now he's comfortable proceeding in English.

THE COURT:  All right.  At any time, Mr. Noh, you wish the interpreter to interpret, would you please let me know?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  At any time if you either can't hear me or you don't understand something, please let me know, and I will be happy to repeat.

So I think at this time the interpreter could be relieved.

THE INTERPRETER:  Thank you, Your Honor.

THE COURT:  If you will just remain in the courtroom in case.  Thank you very much.

All right.  This matter is set on the Court's calendar for sentencing.  Are both sides ready to proceed?

MR. DUBOIS:  Yes, Your Honor.

MR. GLUCK:  Yes, Your Honor.

THE COURT:  All right.  My tentative ruling is quite lengthy.  So you may wish to remain seated at counsel table until it is time for you -- until I finish stating all the bases for my tentative.

The presentence report was disclosed on September the 7th and then the addendum and revised PSR on November the 29th.

Mr. Gluck, have you reviewed those with your client?

MR. GLUCK:  Yes, I have.

THE COURT:  And, Mr. Noh, have you seen the probation office's reports?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Have you discussed them with your lawyer?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  In addition to the presentence reports, I have reviewed the Government's sentencing memorandum filed on November 19th, and there was a supplemental memorandum filed on November 30th.  The defendant's sentencing memorandum filed on November 22nd and December the 2nd.  And, in addition, there were -- I have reviewed all of the letters from employees, family members, friends, and the monitor of the business.

Is this everything that both sides have submitted?

MR. DUBOIS:  Yes, Your Honor.

MR. GLUCK:  Yes, Your Honor.

THE COURT:  Does either side have any objections to the presentence report other than what was set forth in the papers?

MR. DUBOIS:  No, Your Honor.

MR. GLUCK:  No, Your Honor.

THE COURT:  All right.  There were no objections to the guideline calculation.  So the Court would adopt the factual recitations and the guideline calculation.  The Court is required to consult the advisory guidelines, does not presume that the guideline sentence is the appropriate sentence.

Here the guideline range is a sentence between 57 months or just shy of five years to 71 months which is just

shy of six years.  No.  Yes.  Six years.  And that's based on an offense level of 25 which is calculated as follows:

On Count 1, the conspiracy failure to file the form 8300, the base offense level is 6 under guideline Section 2S1.3(a)(2) plus 20 levels under guideline Section 2B1.1 because the loss was more than nine-and-a-half million dollars plus two levels for a pattern of unlawful activity under guideline Section 2S1.3(b)(2).  Then on the conspiracy to commit customs fraud, the base offense level is 26, again, based on the loss under guideline Section 2S1.1(a)(1) and 2T3.1(a)(1) and 2T4.1.

On the conspiracy for money laundering, the base offense level, again, is 26 based on the tax loss.  And on Count 9 the base offense level is 24 under guideline Section 2T1.1(a)(1), 2T4.1(j), plus two levels for failure to report more than $10,000 under 2T1.1(b)(1).  And then there is the three levels for acceptance of responsibility resulting, after the grouping calculation, and the offense level is 25.

The defendant's criminal history category is I.

The Government's sentencing request is a sentence of 57 months.  The defendant's sentencing request is a noncustodial sentence.

Turning to the 3553(a) factors and starting with the nature and circumstances of the offense, the defendant is the co-owner and manager of Ambiance which is a co-defendant in

this case, and his -- the corporation has already been sentenced.  It has offices in Shanghai and Los Angeles.  The company imports and distributes garments.

In between 2010 and 2014, the defendants and others engaged in a scheme to commit customs fraud and to launder money by submitting false invoices that reflected only a fraction of the product's true value to Customs & Border Protection.  The invoices were submitted at the defendant's direction to avoid paying the full tariffs on imported goods, and this defendant instructed manufacturers in China, Vietnam, et cetera, to prepare two invoices for each order, one that reflected only a portion of the value of the order, and that is the one that was given to Customs & Border Protection.

The defendant used a, quote, "undervalue calculator" on the company's computer system that's allowed Ambiance's employees to falsify the value of the importations and, therefore, the amount of duty that was owed.  And then the sellers were wired separately the funds to cover the remaining balance which resulted in undervaluation of the imports by about $83 million and about $17 million in unpaid tariffs or a loss to revenue that was owed to Customs & Border Protection. So after interest of about $1.2 million, the resulting loss is $18,421,443.

$83 million was transferred from Ambiance's bank accounts in the United States to its suppliers' bank accounts

outside of the United States, and the defendants and others also engaged in a scheme to conceal cash sales of merchandise by failing to file reports of cash receipts over $10,000 and concealed cash sales by decreasing sales reported in the business's official records, failed to report income generated from cash sales to external accountants resulting in fraudulent tax returns filed by both defendants.  The corporation is an S corporation, so everything was passed through to Mr. Noh.

The -- according to the probation report, a lot of the large cash purchases were made by drug cartels who bought clothing in order to launder the drug proceeds, but it's clear from the record here that the defendant -- no adjustment to the offense level would have been appropriate here based on the lack of evidence of the defendant's knowledge of that.

The Ambiance employees received currency of more than $10,000 for open invoices of customers about 364 times. This defendant knew about some of them at least.  $11 million in currency was received by the company for which no Form 8300s were filed.  As I said, Ambiance was a Subchapter S Corporation.  Its income flowed through the corporation to the owner without being taxed at the corporate level.  So the reduced figure for cash sales that were reported to the accountants for preparing tax returns didn't accurately reflect all the total income received, and when a search warrant was executed, $35 million in cash was found.  The tax loss in this

case was $16,806,412.

The history and characteristics of the defendant, he's 67.  He was born in Korea.  He's a naturalized United States citizen.  He has four siblings.  Both of his parents are deceased.  His parents -- and I don't remember if the defendant or his siblings were yet born.  But they were forced to move from what is now North Korea to the south and then, again, further from the demilitarized zone.

His father had been a teacher, but after fleeing North Korea, he set up a business with help from relatives which failed, and he was actually incarcerated for just passing a bad check.

The defendant -- and I believe all of his siblings, but certainly this defendant nevertheless achieved his Bachelor's degree.  And he married Annie Noh in 1979.  They have two children.  They moved to the United States in 1985, and they started Ambiance in 2002.  The company now employs at least 200 people, as well, of course, the manufacturing partners of the company employ large numbers of people as well.

The defendant has some physical ailments.  He suffers from hypertension and other conditions.  He has suffered a stroke I believe it was in 2017.  He has damage to his lungs because of an early bout of tuberculosis.

He has a long history of philanthropy, mostly quiet philanthropy, to the university where he graduated in

Korea, to churches, orphanages and individual persons.  But what was impressive from the -- and I read all the letters.  I thank all of those who took the time to write.  I think what was just as impressive is that Mr. Noh is very generous with his comfort and advice and mentorship to others.  Like I said, there were many, many letters which I read.  One of them, in particular, I would point out was from a young woman who received one of the scholarships at the university that the defendant supports.  And she wrote about the impression that it made on her that someone who had succeeded was immediately helping others, and that was the example she really took from the scholarship she received.  And that's a very important example.

He's a person who has always been very generous and fair with his employees but, again, not just in terms of financial support and especially from the pandemic but advice and support.  And many of his employees have gone on to start their own businesses with the help of his example and his support and advice.

The need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment.  I find I say this in almost every case.  Every case is unique and different.  But one thing that was quite unusual about this case, in my view, is that this conduct was not motivated by greed as far as I can discern from

the record.  That really sets it apart from every other tax evasion case that I have ever seen.  The defendant certainly, as the Government points out, lived a very -- more than comfortable, a wealthy lifestyle, with the proceeds of his business but, again, has always been generous even when he did not have large amounts of money.

So I think the roots of the conduct go back, as the defense pointed out in the sentencing papers, go back to the defendant's history and growing up in Korea and watching what happened to his father and his fear of not being able to provide for his family and the employees at his company.

However, the amounts involved here I think are staggering.  There was the $11 million in cash proceeds, the understatement of the income tax, various conspiracies.  And these cases are hard to investigate.  Essentially the tax system is largely a voluntary one that depends on the good faith and honesty of all of us.  When someone avoids paying their fair share to such a very great degree, that's a very serious offense.

The need for the sentence to afford adequate deterrence to future criminal conduct, the conduct began when there was a spike in cotton prices, and that led to some concerns about the viability of the business although I don't think that was really much of an instigating motive here.  But the defendant has been in full compliance since 2014 and since

2012 has reported all of the cash received, and that was before this investigation.

And important for that point is the letter received from the monitor who has been in place to monitor the business who reports that the defendant's business is above and beyond in its compliance now.

The need to protect the public from further crimes of the defendant, this defendant pled guilty right away. He voluntarily gathered his employees to tell them about the crimes, the offenses.  So he has accepted responsibility in an exemplary manner.  And as I said before, the monitor wrote to the Court about the defendant's exemplary practices since the investigation.  So it's hard to predict.  I don't really see a likelihood of future crimes here.

And the sentence, in comparison with other sentences and the need to avoid sentencing disparity, the guideline sentence here would be a sentence of -- at the low end of about five years.

Finally, the need to provide restitution.  The defendant has already complied and continues to comply with the restitution that's needed in this case.

I don't think a sentence of 57 months is necessary in this case to reflect the seriousness of the offense or to meet any of the other goals and considerations for sentencing that I have described.  And I do take into

account the defendant's age and his physical limitations and what's been done sense in terms of compliance.  But I think a term in custody is warranted here because of the seriousness of the offense and the very large amounts.

Also, in terms of the nature of the offense, it wasn't a one-time mistake.  It was a scheme that went on for some period of time and involved forethought for the use of the program on the computer to undervalue merchandise and have a two-invoice system.  That shows calculation, and I think that's an important consideration.

The defendant's background, it's, of course, coincidental the two matters that I had on calendar this morning for sentencing, very different offenses.  But this defendant worked very hard to get his education, but he had an education.  He had a successful business and, nevertheless, committed a crime over a period of time.  And I think that sadly enough warrants a term in custody.

So my intended sentence is a sentence of 12 months and one day in custody, the statutory period of supervised release with the conditions that are set forth but an additional condition that the defendant participate in a community service component, once he's released from custody, of a total amount -- a total number of hours of 200 hours.  And, of course, this isn't community service in the form of picking up trash on the side of the highway.  But I think that

Mr. Noh would have the ability to continue to help others in terms of counseling small businesspeople and others.  And that's the form of community service that I think would be appropriate.  So that would be my recommendation to probation in terms of fashioning a type of community service that really fits what he is able to contribute.

Mr. Dubois.

MR. DUBOIS:  Thank you, Your Honor.  Just to make a couple additional points focused on the tentative, the Government feels that 12 months and a day is insufficient in this case to promote general deterrence and respect for the law.  This is one of the Fashion District cases.  This is, as stated in the papers of the defense, something that happens all the time down there.

But I want to take a second and think about it a little differently than it was framed in their papers.  It's hard to separate -- sometimes it's easy for us when we are talking about guidelines to talk about Ambiance's legitimate business and then the criminal conduct as two separate things, but they are to a large degree interrelated.  The amount of money in this case, which as Your Honor said was staggering, allows Ambiance, controlled by defendant, to charge prices that are super competitive, and this is a challenge for others.  And Ambiance is one of the largest businesses out there, and this is a difficult thing for smaller businesses.

So the idea that everyone else was doing it and Ambiance gets onboard, I don't know that that is entirely accurate with the facts on the ground. This is a much more symbiotic relationship where you make the decision to play this game knowing it's illegal, knowing there's two sets of books, knowing there is an undervalue calculator with respect to the customs fraud, ignoring notices from HSI with respect to filing currency transactions, and it allows your business to thrive. And I understand --

THE COURT: It's an unfair advantage is what I think you are saying.

MR. DUBOIS: Exactly. I think for a business on the scale, the amounts that they were able to recover from the criminal conspiracy gave them a significant unfair advantage.

And I think, also, you know, the motivation here, if not greed, the idea that one wants to take care of one's family, employees, loved ones, that's a perfectly understandable motivation. It's a motivation that all of us I think in this room probably share to a large degree. But taking care of those people means different things for each of us, and I don't know that this kind of massive fraud is what's needed to ensure that those people are taken care of.

This isn't the loaf of bread case, for example. Obviously that's the farther end of the spectrum, but I think the point needs to be made that despite the good intentions of

some of these motivations, they're totally out of whack with that motivation.

And I think, you know -- I agree with Your Honor's statement that the sums and the length of time of the criminal conduct here belie the suggestion that it was motivated in large part by a shock in cotton prices.  I think this was more a general business practice over a lengthy period of time that was able to allow Ambiance to operate at a much higher level than it otherwise would have.

I think, Your Honor, that while -- in this case the defendant's own recidivism is a mitigating factor.  The Government concedes that.  The bigger issue here is that a sentence of 12 months and one day I don't think will adequately address the need.  And I understand there are individual concerns for the defendant.  I think those still don't bring us down to 12 months and a day when you consider the serious need in this case for general deterrence and promoting respect for the law for similarly situated defendants who will treat this as a cost of doing business if the sentence is too low because I think imprisonment, as Your Honor stated, is necessary in this case, and I think it needs to be of a longer term than what you are contemplating.

THE COURT:  All right.  Thank you.  While I agree -- and I perhaps did not state this -- that deterrence in any sentencing framework is general as well as specific.  So

although I don't think there is a risk here of future criminal
conduct, I agree with the Government that deterrence is a
general concern as well.

All right.  Mr. Gluck.  And would you and your
client please approach the lectern.

MR. GLUCK:  Thank you, Your Honor.

Just to briefly respond quickly to the
Government's comments, just to be clear, the 2014 raid in the
Fashion District that the Government conducted which involved,
according to their press releases, some thousand agents and
dozens of locations, it is true, absolutely true, that it was a
pervasive problem in the Fashion District at the time, and it
is also true that Ambiance had an advantage and I suppose one
can characterize it by the conduct they were committing which
was persuasive.  In other words, everybody in the industry --
not everybody but many, many people in the industry were doing
that.

Since 2014 Ambiance has thrived.  It has grown
many, many times in the last seven years, and it has complied
with the law completely.  So the notion that the criminal
conduct is somehow intertwined with the company is inaccurate
at least for the last seven years.

I would also point out just, Your Honor, two
factual issues that we think are -- I'm not sure they change
where the Court should be going but just to make the record.

First of all, the -- it is true that Ambiance and Mr. Noh directed vendors to create two invoices.  There were business purposes for that before the customs fraud began and after the customs fraud ended.  The way they pay for things is with two separate invoices.  So it wasn't as if that way of doing business was solely designed in order to commit fraud.

What happened was, wrongly and illegally, they failed to disclose one of the two existing invoices.

THE COURT:  What was the business reason?

MR. GLUCK:  Because one invoice is -- every -- most every purchase that Ambiance engages in is paid in two pieces.  One is by letter of credit, and one is by wire.  And because of the way the letter of credit works, it has to have its own invoice with the -- with that portion of the payment.

THE COURT:  But I guess my question is why was it necessary to pay with both by wire and by letter of credit? What was the business reason?

MR. GLUCK:  Those are the terms they negotiate. Using a letter of credit is more expensive, but it pays the vendor immediately.  A wire is cheaper, and it pays the vendor later.  So part of the negotiation of the price is how much will you pay, how much do we get now by letter of credit, and how much are we going to get later by wire?

THE COURT:  I see.

MR. GLUCK:  And Mr. Noh is also pointing out that

the letter of credit draws on a limited line of credit, and so they need to monitor that to make sure they don't run out of credit.  So just pointing that out so that the record is accurate.

And, also, as to the probation report, I believe the probation report said that some of these cash deposits were related to a Government undercover that apparently was, in fact, money going to some drug cartel, I suppose, although we don't -- we on our side don't know the details of all of that.

But beyond that -- and I'm not trying to say that cash doesn't present a danger of supporting drug trafficking.  But that -- beyond the specific transactions that the Government has identified as being part of their undercover, the rest of the transactions, there doesn't seem to be evidence one way or the other that -- other than the general concept but that any particular transaction was, in fact, connected to the cartel.

And, then, Your Honor, I -- just, in general, I do want to point out there's a big crowd in the courtroom of many, many people who are here to support Mr. Noh including his wife Annie and his children as well as a number of employees, customers who have traveled from overseas to be here, friends, a number of church members including his priest.  Fr. Ha is here as well.

We have laid out our material in the sentencing

position.  We appreciate the obvious care with which the Court considered all of it.  We do not dispute at all the wrongfulness of what Mr. Noh did.  He does not dispute it, and he admits it.

I think the Court is correct that this is an unusual case.  The amounts of money are staggering.  Mr. Noh has been very, very successful and was very lucky to be able to achieve that success.  And as he will explain to the Court or has explained to the Court, he regrets his bad decisions that brought him here.

We believe that the Court's tentative addresses the issues that we have raised, and we appreciate it.  With that, we would submit unless the Court has any particular questions.

THE COURT:  Thank you.

Mr. Noh, you have the right to speak at this time before I make a final decision if there's anything you would like to say.

THE DEFENDANT:  Your Honor, first of all, I'd like to deeply apologize to the Government, the Court and community and my church and my customers and my employees and all the people who depend on me for work that I disappointed them because of this case.  Without listing the reasons, those were wrong and against the law.  That's why I agreed to plead guilty.

It was the most painful lesson in my whole life. It was a very, very expensive lesson to my family and to my company. With the Government's raid in 2014, there were strong messages delivered to the market. So today's market is very different from old days. We have complied with the law since then. I'm glad that companies make sure that everything was done right. Actually, we had another order from another monitoring company which was about three years ago. We confirmed that everything was hundred percent clean and we are doing right. Unless we are very stupid, there is no reason why we need to do those things again.

I won't justify anything, but there was some reason that -- I agree those were wrong, and we promise that we continue to keep everything hundred percent clean and go by the law.

Again, I'm really sorry for everyone, Your Honor.

THE COURT: Thank you.

I intend to abide by my intended sentence with a self-surrender date after the first of the year. I would ask counsel, because I think some payments have been already made, if the disclosed recommendation letter is still accurate as to the amount of restitution that remains due, which reflects about the 18.4 million to Customs and 16.8 million to the IRS -- are those numbers still accurate?

MR. DUBOIS: They're accurate, Your Honor, and my

understanding is that that was from seized money that the Government had in its possession and has already turned it over to the court for disbursement to the Customs & Border Protection and IRS.

THE COURT:  So there really isn't -- I should reflect that restitution was ordered in that amount, but the restitution obligation has been satisfied.

MR. DUBOIS:  That is correct, Your Honor.

THE COURT:  All right.

MR. GLUCK:  Your Honor, I'm sorry.  I think it might be a little more complicated than that.  The money is in the Government's possession, but my understanding from speaking with counsel -- prior counsel on the Government's side was that there had to be an order that would basically effectuate the transfer of that money so that it could be used for forfeiture -- I'm sorry -- for restitution.

MR. DUBOIS:  Right.  My understanding is that money has been paid to the court and is ready for disbursement.

THE COURT:  All right.  So then the language in the disclosed recommendation letter is accurate.

MR. GLUCK:  Yes, Your Honor.

THE COURT:  The restitution must be ordered because it has to come from the funds that were seized.

MR. DUBOIS:  Correct.

THE COURT:  All right.  Thank you.

Is there any legal cause why sentence should not now be pronounced?

MR. DUBOIS:  Not for the Government, Your Honor.

MR. GLUCK:  No, Your Honor.

THE COURT:  All right.  The Court has considered the factors set forth at 18 United States Code Section 3553(a) as well as the advisory sentencing guidelines and hereby imposes the sentence as follows:

It is ordered that the defendant shall pay to the United States a special assessment of $200 due immediately. Any unpaid balance shall be due during the period of imprisonment pursuant to the BOP's Inmate Financial Responsibility Program.

It's ordered that the defendant shall pay restitution in the total amount of $35,227,855.45.  Pursuant to 18 United States Code Section 3663(a) and as reflected on the record from statements of counsel, this is the amount that is ordered paid from the amounts subject to the forfeiture order. So the amount of $18,421,443.41 is to be paid to the Department of Homeland Security Customs & Border Protection and the amount of $16,806,412.04 payable to the Internal Revenue Service. Restitution shall be paid in full immediately.

And the Court finds from a consideration of the entire record that the defendant's economic circumstances allow for full and immediate payment of restitution.

He's to be held jointly and severally liable with co-defendant Ambiance for the amount of restitution ordered. The victims' recovery is limited to the amount of their loss, and the defendant's liability for restitution ceases if and when the victims receive full restitution.

The defendant shall comply with second amended General Order No. 20-04.

It's ordered that the defendant shall pay to the United States a total fine of $10,000 bearing interest as provided by law. The fine is to be paid in full immediately.

The defendant shall comply with General Order No. 20-04. And the Court's money judgment of forfeiture against the defendant, which has been entered, is hereby incorporated by reference into this judgment and is final.

Pursuant to the Sentencing Reform Act of 1984, it's the judgment of the Court that the defendant Sang Bum Noh is hereby committed on Counts 1 and 9 of the Information to the custody of the Bureau of Prisons for a term of 12 months and one day.

Upon release from imprisonment, he's to be placed on supervised release for a term of one year under the following terms and conditions:

He's to comply with the rules and regulations of the U.S. Probation Office and second amended General Order 20-04 including the conditions set forth in Section 3 of

second amended General Order 20-04.

He is to pay the special assessment fine and restitution in accordance with this judgment's orders regarding such payment.

He shall cooperate in the collection of a DNA sample from the defendant.

He shall truthfully and timely file and pay taxes owed for the years of conviction and shall truthfully and timely file and pay taxes during the period of supervision and show proof to the probation office of compliance with this order.

He shall apply all monies received from income tax refunds, lottery winnings, inheritance, judgments, and any other financial gain to the court-ordered financial obligation, that is, restitution.

He shall submit his person, property, house, residence, vehicle, papers, computers, cell phones, other electronic communications or data storage devices or e-mail accounts, social media accounts, cloud storage accounts or other areas under his control to a search conducted by a U.S. probation officer or law enforcement officer.  Failure to submit to a search may be grounds for revocation of supervision.  The defendant shall warn any other occupants that the premises may be subject to search pursuant to this condition, and any search under this condition must be

conducted at a reasonable time, in a reasonable manner, upon reasonable suspicion that the defendant has violated a condition of his supervision and that the areas to be searched contain evidence of the violation.

And the defendant shall complete 200 -- he's on one year of supervised release.  The defendant shall complete 100 hours of community service as directed by the probation office, and the Court recommends that the probation office devise a program for the defendant to use his education and experience in business to counsel or perform service to small business owners.

The Court orders that the drug testing condition otherwise mandated by statute is suspended based on the Court's determination that this defendant poses a low risk of future substance abuse.

It is ordered that the defendant shall surrender himself to the institution designated by the Bureau of Prisons on or before 12:00 o'clock noon on Monday, January the 10th, 2022.  In the absence of a designation from the Bureau of Prisons, the defendant shall report on or before that date, Monday, January 10th, 2022, to the United States Marshal located at the First Street Courthouse, 350 West 1st Street in Los Angeles.

MR. GLUCK:  Your Honor --

THE COURT:  Mr. Gluck?

MR. GLUCK:  Can we make that January 11th?

THE COURT:  Sure.  It's probably easier for the marshals.

MR. GLUCK:  Exactly.  Thank you.

THE COURT:  All right.  January 11th.

Mr. Noh, under the terms of the plea agreement that you signed and by pleading guilty, you have given up almost all of your rights to appeal your conviction and your sentence, but I'm still required to tell you about the appeal process.

So a defendant may appeal by filing a Notice of Appeal with the clerk of court, may ask that he be allowed to file the Notice of Appeal without paying the fee that's required.  You have 14 days to file any Notice of Appeal or you lose the right to appeal, 14 days of today or two weeks.

Do you understand?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  And I believe there are other counts to be dismissed?

MR. DUBOIS:  No, Your Honor.  Defendant pleaded guilty to the two counts that charge him personally.

THE COURT:  That's right.  The rest is -- it's Counts 1 and 9, but the rest are the Ambiance counts.

MR. DUBOIS:  That's correct, Your Honor.

Just one clarification while I'm standing.  When

Your Honor spoke, I got a little confused and wanted to clarify that the restitution amount does not come from the 81- and change forfeiture amount that was ordered separate.

THE COURT:  I'm sorry.  If I said forfeiture amount, that was incorrect.

MR. DUBOIS:  Thank you, Your Honor.

THE COURT:  Thank you.  All right.  Anything further?

MR. GLUCK:  Your Honor, we ask that Mr. Noh be designated to Lompoc or recommendation that he be designated to Lompoc.

THE COURT:  All right.  That will be the recommendation, and bond will be exonerated when he reports to the institute designated by the BOP.

MR. GLUCK:  Thank you, Your Honor.

MR. DUBOIS:  Thank you, Your Honor.

THE COURT:  Thank you.

(Proceedings concluded at 10:43 a.m.)

CERTIFICATE OF OFFICIAL REPORTER


                I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME

COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

THE UNITED STATES.


                        DATED THIS  18TH  DAY OF JUNE, 2025.



                        /S/ MIRANDA ALGORRI

                        _____
                        MIRANDA ALGORRI, CSR NO. 12743, CRR
                        FEDERAL OFFICIAL COURT REPORTER